(No. 12659.—Judgment reversed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in
Error, vs. FRANK GEISTER et al. Plaintiffs in Error.

*Opinion filed October 27, 1919.*

1. CRIMINAL LAW—*when entries made in course of business
must be proved correct.* Where the party who makes entries in
the due course of business is living and sane and is not permanently
out of the State such entries must be proved by him to have been
so made and that they are correct and true entries before they can
be admitted in evidence between third parties as proof of the facts
therein recited.

2. SAME—*what necessary to sustain allegation of ownership in
carrier.* In an indictment for larceny, charging the theft of goods
from a freight car during shipment, the allegation of ownership
in the railroad company must be proved beyond a reasonable doubt
by evidence either that the company owned the goods or was in
the actual possession thereof.

WRIT OF ERROR to the Criminal Court of Cook county;
the Hon. HENRY GUERIN, Judge, presiding.

LYNN & HALLAM, and GEORGE A. OLIVER, for plaintiffs
in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY
HOYNE, State's Attorney, and FLOYD E. BRITTON, (ED-
WARD E. WILSON, and JUSTIN F. McCARTHY, of counsel,)
for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

The plaintiffs in error, Frank Geister and Charles Ja-
cobi, were jointly indicted with Anthony Rosetskis in four
counts. The first count charged the larceny of three sew-
ing machines, of the value of $56 each, and fifty-two bolts
of cloth, of the value of $21.20 each, the personal goods
and property of the Belt Railway Company of Chicago.
The second count charged the buying, receiving and con-
cealing of the said goods and chattels of the railway com-

pany knowing them to have been stolen. The third and fourth counts charged the burglary of a certain freight car of said railway company with intent to steal the personal goods, money and property of said corporation. Plaintiffs in error were tried jointly in the criminal court of Cook county, the other defendant not being tried. Geister was found guilty of larceny on the first count and the value of the property stolen was found to be $103.50, and Jacobi was found guilty of receiving stolen property of the same value under the second count. Motions for new trial and in arrest of judgment were overruled and each defendant was sentenced to the penitentiary.

The Singer Sewing Machine Company on April 11, 1918, at South Bend, Indiana, loaded 140 of its sewing machines into freight car No. 75247 of the Wabash Railway Company for shipment to itself at Racine, Wisconsin, and sealed the car with its own seals. When the car arrived at Racine there were only 137 machines in it, the three missing being numbered G4483876, G4494308 and G5696460. The car was inspected by the inspector of the Wabash Railway Company at about eight o'clock P. M. of April 12, 1918, and the seals on the car were found intact on both sides of the car. The car then passed over the line of the Belt Railway Company, a transfer road running from South Chicago through Clearing, in Cook county, to West Chicago, and on inspection by an inspector on that line the seals were found intact at about 10:30 o'clock P. M. of April 13, 1918, at the east receiving yards on that line at Forty-eighth street, Chicago. The conductor on the Belt line that carried the car in question in a train of over forty cars, about midnight of April 13 saw the door of a box-car in his train open while at West Chicago and saw a crate of sewing machines in the car marked "Singer" but could not testify whether or not the car was sealed at the time he received it, and the evidence does not identify the car that he saw with an open door as Wabash car No. 75247.

It was proved by the entries in the book of the seal-taker of the Chicago and Northwestern Railway Company, without proof of the correctness of the entries therein, over the objections of the plaintiffs in error, that after that company received the car in question from the Belt line the seal on the east side of the car was broken when it was inspected on the receiving tracks of that company. Near one o'clock A. M. of April 14, 1918, two special police officers heard wood falling and the breaking of boxes along the side of the track of the Belt line at Fifty-ninth or Sixtieth street, Chicago, about two or three miles west of Clearing and east of the West Chicago station. It was a foggy morning, and they discovered three or four men at the place from which the noise came and about 150 feet from them, and called "Halt!" and began firing. Shots were returned and the men all ran away except one, Martin Petro, who had been shot in the back by the officers. He was carried to Englewood Hospital, where he died nine days later. The officers found at the place where he was shot, water buckets, tin pails, fifty-four pieces of kitchenware, fifty-two bolts of cloth, but no sewing machines. The officers could not identify any of the other men who ran away from the supposed stolen goods, none of which goods were shown to have been in or taken from Wabash car No. 75247 or from any other car of that train.

The evidence does not shed any more light than the above facts on the question of the point between South Bend, Indiana, and Racine, Wisconsin, where the missing sewing machines were taken from the car, if they were taken therefrom, or in what manner they were taken. There is no station on the Belt line between Clearing and West Chicago, and no proof in the record that the train that carried the sewing machines in question stopped between those stations. The evidence does not show that the Belt Railway Company was at any time the owner or in possession of the sewing machines or the car in which they were

shipped. It does positively show that the machines were owned by the Singer Sewing Machine Company, and that the Belt Railway Company at the time the car passed over that line was in the possession of and was being operated and controlled by the United States government, under William G. McAdoo, Director General.

It was error to admit the entry in the book of the seal-taker of the Chicago and Northwestern Railway Company. The party who made the entry is living and was only temporarily absent in one of the training camps of the government when the trial was had and was not present to prove that the entries were made in due course of his employment and that they were correctly made. It was proved that it was part of his regular duty as such seal-taker to make entries showing the condition of the seals on all cars passing under his inspection, but the witness so testifying never saw the entries made and positively testified that he did not know whether or not they were correct, and he, of course, did not know when they were made. Where the party who makes entries in the due course of business is living and sane and is not permanently out of the State, such entries must be proved by him to have been so made and that they are correct and true entries before they can be admitted in evidence, as between third parties, as proof of the facts therein recited. (2 Jones' Com. on Evidence, secs. 319, 320.)

No attempt was made to prove the ownership of any of the goods or property found where Martin Pietro was shot except by the bare facts already stated, and the same is true of the bolts of cloth described in the indictment. It was not shown that any of said goods were in the car with the missing sewing machines or had ever been in any car on the Belt line or that any of them had ever been stolen, except by the alleged confessions of Frank Geister hereinafter related. There could therefore be no conviction of either of plaintiffs in error in this case as to such prop-

erty, and there is no such claim by the State. It was incumbent on the State to prove, beyond a reasonable doubt, that the Belt Railway Company owned or was in the actual possession of the sewing machines in question to sustain the charge of ownership in that carrier as alleged in the indictment. (*Aldrich* v. *People,* 225 Ill. 610.) The People failed to make that proof and the judgment of conviction cannot stand as against either of the plaintiffs in error.

The testimony of three witnesses was offered to convict plaintiff in error Jacobi, the first of whom testified that he saw two men coming out of a shed on Fifty-fourth street, Chicago, on the night of June 21 or 22, 1918, with a sewing machine and walk rapidly down the street to an automobile standing in front of Frank Geister's home, about 700 feet from the shed, and place the machine in the rear of the automobile; that they then turned the machine around and drove west on Fifty-fourth street; that he tried to follow them but they put out the lights on the automobile; that he then went to the shed, which stood about 100 feet from the street and which was fenced with a wire fence, and in it found a bed, a wheelbarrow, a couple of shovels and a sewing machine wrapped in rags, with the number of the machine covered with paint. This latter sewing machine was produced in court as an exhibit, and was a Singer sewing machine numbered S8850043. The evidence showed that the number on the machine had been changed, but no evidence was offered to show that this machine was one of the machines shipped to Racine and found missing on the arrival of the car of machines. The record does not disclose the make or character of the sewing machine taken away by the automobile. The second witness against Jacobi testified that he was a professional gambler and a chauffeur and did most anything; that one time,—he could not give the year or month but thought it was "after July 4" but was not sure,—Jacobi left notice with a barber in Cicero, where witness lived, that he wanted to see him; that he

went to Jacobi's house about eight o'clock one evening and Jacobi told him to come back later, after dark; that he accordingly went back between nine and ten o'clock; that Jacobi hired him to take away a sewing machine, saying he would pay him "for the gas for hauling it;" that he took the job and hauled the machine to the north side with his automobile; that Jacobi rode ahead of him on a motorcycle; that they got the machine out of a shed near Jacobi's home, on Seventy-second street and some other street that he could not remember. He further testified that he had had his automobile about a year and a half but could not remember when he sold it, and that he never rode with Jacobi before that time. The record does not disclose who owned or was in possession of the shed. There is no evidence to identify this machine so taken from the shed, if it was so taken, as one of the machines alleged to have been stolen, and there was no evidence as to how it came to be in the shed or who claimed to be the owner of the shed. The third witness, Charley Pietro, testified that after Martin Pietro's death he was in his brother's home and saw the plaintiff in error Jacobi there fixing a yellow sewing machine,—putting parts of the machine together which he was taking out of a set.

Jacobi denied all knowledge or connection with the theft of the sewing machines or of ever having one in his possession at the shed in question or of ever having taken one from that shed, and denied fixing a sewing machine at Mrs. Pietro's or of ever having worked at fixing sewing machines, and denied *in toto* the evidence of the witness who testified that Jacobi hired him to haul a sewing machine from that shed. The evidence is entirely insufficient to convict Jacobi of having in his possession the stolen machines, or any one of them, knowing them to be stolen, as it fails to establish beyond all reasonable doubt that he had any one of the stolen machines in his possession or that the machine claimed to have been taken by him and

the chauffeur from the shed was one of the stolen machines in question, and for the further reason that the ownership of the machines alleged to have been stolen was not proved as alleged in the indictment.

On Sunday morning, April 14, 1918, Mrs. Mary Pietro went to Frank Geister's home and requested him to go to the home of her brother-in-law, Stephen Ruika, and see why her husband, Martin Pietro, had not come home. He asked her why Charley Pietro (Martin's brother) could not go, and she told him he had gone to Cicero the day before and had not come home. Charley Pietro lived at Martin Pietro's, and on Saturday afternoon of April 13, 1918, near the same hour, both left their home and neither of them had returned. Geister went to Ruika's house, about six miles away, as requested by Mrs. Pietro, after inquiring the way, and later reported that Mrs. Ruika had informed him that Martin had been there the night before but left about eleven o'clock. Five detectives went to Martin Pietro's house just after Geister had gone to Ruika's and searched the house, and told Mrs. Pietro, through Charles Jacobi, whom Mrs. Pietro had sent for to act as interpreter, that her husband had been shot. She then went to the hospital where her husband was, and asked Mrs. Geister to go with her.

· The State relied on six Lithuanians,—James Ruika, Stephen Ruika and his wife, Bessie, who is a sister of Martin and Charley Pietro, Sophia Ruika, sister of Stephen and James Ruika, Mrs. Sophia Miller, mother of James and Stephen Ruika, and Charley Pietro,—all of whom testified through an interpreter, for the conviction of Geister. The substance of James Ruika's testimony is that all six of them met at Martin Pietro's on Sunday afternoon, April 14, 1918, and that Geister and his wife and Mrs. Pietro were there also; that Geister stayed only ten or fifteen minutes and simply detailed what he claimed happened at the time Martin Pietro got shot; that he said he was tired out,

working; "that they were out on the tracks and they hauled
one load home and went over for the second load and Mar-
tin Pietro was shot while on the railroad tracks; that he
didn't know what had happened; that he left them there,
and also said something about some sewing machines." He
also testified that he had some talk with Geister as they
were coming from the hospital where Martin was, and that
Geister said: "Between you and me, I will tell you they
have all kinds of dishware, clothes, and all other things.
Some Singer sewing machines are at home, and some are
hidden somewhere in the ditch and in the fields. Never
mind; I will hire about five or six witnesses and that will
be all right." Stephen Ruika and his wife, Bessie, both
repeatedly stated in their testimony that it was not Geister
that did the talking at Mrs. Pietro's but Mrs. Geister. Mrs.
Miller testified positively that it was Mrs. Geister and not
Geister that did the talking at Mrs. Pietro's. Charley Pie-
tro in a way corroborates James Ruika in his testimony
that Geister made the statement at Mrs. Pietro's testified
to by Ruika, but in answer to the question, "Did Geister
say anything about what happened the night before?"
his answer was, "Geister's wife was talking about it." We
are strongly impressed with the belief that if any talking
at all was done at Mrs. Pietro's that Sunday evening it
was done by Mrs. Geister and not by Geister, as she was
the one that had just come from the hospital. The at-
torney for the State, however, persisted repeatedly, over
the defendants' objections, in asking these witnesses to state
what Frank Geister said on that occasion, after some of
them had positively and repeatedly informed him that it
was Mrs. Geister and not Geister that did the talking, and
by his persistence caused them later to say, by misunder-
standing or through fear, that Geister did the talking. Mrs.
Geister was an incompetent witness. Mrs. Pietro testified
positively that Geister did not do any such talking at her
house that afternoon. Geister denied it, and denied utterly

any connection with or knowledge of the theft and all conversations attributed to him tending to show he was present or with Martin Pietro when shot. The evidence proved that he was a stockholder and director of the Metropolitan State Bank and a carpenter and builder, and had a good reputation for truth and veracity, honesty and fair dealing. He also proved by himself and two other witnesses that he was at home on the Saturday night in question at nine o'clock P. M. and until one o'clock A. M. the next morning.

It was proved, without any attempt at denial, that five detectives took Mrs. Martin Pietro to one of their offices in Clearing. While otherwise unaccompanied they importuned her to tell them something about Geister and the sewing machines, and said they were going to put him in the penitentiary for ten years. They threatened to jail her if she did not tell the truth, and told her that she must tell about Geister because he was with her husband that night. Although she repeatedly told them that she knew nothing, they continued to threaten her and offered to get money from the company for her if she would help them in the case. The detectives also arrested Geister on June 21, 1918, and charged him with stealing the sewing machines and named the Ruikas as his accusers. They put him in jail and refused him all opportunity to consult an attorney or to give bond or to have a hearing before the justice. They sought to induce him to confess by employing all manner of threats and brutal actions toward him and his family. They carried him to his own house, searched his premises, opened up all the drawers and private places in his house and turned their contents upside down, took away a watch, a bracelet and a breast pin belonging to his wife, struck his brother-in-law over the head with a revolver when he attempted to call the city police, held his wife by the arm and told her to shut up or they would shoot her like a dog, but nevertheless they got no information of any character that in any way connected Geister with the crime. The

289 — 17

indictment in the case was indorsed by but one witness, Foster, one of the so-called detectives, and he never testified at all. When the witnesses for the State were called to be sworn the court overruled plaintiffs in error's objection to their testifying on the ground that their names were not indorsed on the indictment and that no notice had been given the defendants that such witnesses would be called against them previous to their being sworn. The court gave them a short time to interview the witnesses, which had to be done largely by an interpreter.

There is another reason for discrediting the testimony of the six Lithuanians aforesaid. Sophia Ruika and Charley Pietro undertook to collect claims against Martin Pietro or his wife before his death and even after he was shot. Mrs. Ruika insisted on her paying $100. Charley Pietro first claimed $600 from her, and later $900. They tried to collect these claims by threats both before and after Martin Pietro died, and having failed to get the claims paid or to get the house and lot Martin owned, Charley Pietro offered to marry his brother's widow in less than a week after her husband died, and asked Geister to advise the widow to marry him. When Geister admonished him that it was not a decent time in which to marry or to propose marriage and that he could not take the property away from the widow and her surviving child, he beat up the widow and left the place and threatened that he would fix Geister, who he said was advising the widow against his interest. He also collected $36 owed to Martin Pietro for wages from his employer before Martin's death and without notice to him or Mrs. Pietro. The evidence clearly shows that the whole Ruika family were incensed at Geister because of his advising the widow against paying Bessie and Charley their claim or because they supposed he had done so. All the Ruika family refused to attend Martin's funeral or to send any flowers because the funeral was at Geister's house. It was held there by request of Mrs. Pie-

tro, because the undertaker had informed her that he could not get to her house with the hearse on account of the wet and muddy streets, there being no pavement extending to her house. Bitter malice of this character knows and recognizes no bounds when it is employed against the persons against whom the same is entertained. There were many more reasons for supposing Charley Pietro and some of the Ruikas were the parties who accompanied Martin Pietro to the place where he was shot than for supposing Geister and Jacobi were with him, if the evidence of the Ruikas and Charley Pietro be eliminated. The evidence is undisputed that Geister did not know and had never seen either Stephen Ruika or his wife before he went to their house to inquire for Martin Pietro, and it is very unusual for any man to make such confessions voluntarily to strangers or in their presence as are attributed to Geister in this record. Bessie Ruika testified that when Geister came to her house on that Sunday he told her that if anybody asked her about Martin Pietro she should say that Martin came to her house about six o'clock on Saturday evening and went away about eleven P. M. so drunk he could not find his way home and got lost. She was positively contradicted in this statement by Geister. She was also contradicted by Mrs. Pietro and Rose Elderman, the latter being an entirely disinterested witness, in another matter. Both these witnesses affirmed, and Bessie Ruika denied, that she (Bessie) said at the hospital the day Martin Pietro died, that it was her fault Martin got shot; that she was sorry she did not keep him at her house that Saturday night; that "they had been drinking" at her house and that she let him go home about eleven o'clock.

For the reasons aforesaid the judgment is reversed as to both plaintiffs in error. As the evidence positively shows the ownership of the sewing machines as laid in the indictment was not and cannot be proved, the cause will not be remanded.                    *Judgment reversed.*